1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  E.P.,                                          No. C05-01390 MJJ

12              Plaintiff,                          **ORDER DENYING PLAINTIFF'S
                                                    MOTION FOR SUMMARY JUDGMENT**
13      v.                                          **AND GRANTING DEFENDANT'S
                                                    CROSS MOTION FOR SUMMARY**
14   SAN RAMON VALLEY UNIFIED SCHOOL                **JUDGMENT**
     DISTRICT,
15
                Defendant.
16  _____/

17

18          Pending before the Court is Plaintiff E.P.'s Motion for Summary Judgment, (Doc. #15),

19  appealing the decision of the Special Education Hearing Office ("SEHO") denying Plaintiff's claims

20  for relief from the San Ramon Valley Unified School District ("District").  Also pending before the

21  Court is the District's Cross Motion (Doc. #20).  For the following reasons, the Court **DENIES**

22  Plaintiff's Motion and **GRANTS** Defendant's Cross Motion.

                            **FACTUAL BACKGROUND**

23  **A.      Statutory Background**

24          Plaintiff is a disabled child who is eligible for special education and related services under

25  the Individuals with Disabilities Education Act ("IDEA").  The IDEA provides state and local

26  agencies with federal funding to assist in educating children with disabilities.  20 U.S.C. § 1412(a).[1]

27  However, receipt of these funds is conditioned on compliance with certain goals and procedures.

28  _____

[1]This case involves Plaintiff's educational placement for the 2004-2005 school year.  The statutory and
administrative provisions of the IDEA in effect at that time therefore apply.

*See* 20 U.S.C. § 1412(a); *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993).  One

such condition is "to ensure that all children with disabilities have available to them a free and

appropriate public education ("FAPE") that emphasizes special education and related services

designed to meet their unique needs[.]"  20 U.S.C. § 1400(d)(1)(A).  To achieve this, the IDEA

requires development of an individualized education program ("IEP"), *see* 20 U.S.C. § 1401(11),

that is crafted by an IEP team made up of the parents, at least one regular education and one special

education teacher of such child, a representative of the local educational agency, and, at the

discretion of the district or the parent, others knowledgeable about the child.  20 U.S.C. §

1414(d)(1)(B).  An IEP team must set forth the IEP in a writing comprised of a "statement of annual

goals and short-term instructional objectives; a statement of the specific educational services to be

provided and the extent to which the child can participate in regular education programs; and

objective criteria for measuring the student's progress."  *Ojai*, 4 F.3d at 1469; *see also* 20 U.S.C. §

1414(d)(1)(A).

 To assure each child is afforded protection under the IDEA, several procedural safeguards

exist within the IDEA.  *Ojai*, 4 F.3d at 1469.  One of these important procedural safeguards is the

parent's right of involvement in the development of their child's IEP.  *Amanda J. v. Clark County

Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001).  Notice of any changes in the child's educational

placement, or their FAPE, and the ability to "bring a complaint about 'any matter relating to' such

evaluations and educational placement" are also aspects of the IDEA's procedural safeguards.  *Ojai*,

4 F.3d at 1469 (quoting 20 U.S.C. § 1415(b)).  Flaws in procedures do not automatically require a

finding of a denial of a FAPE.  *W.G. v. Bd. of Trustees of Target Range Sch. Dist.*, 960 F.2d 1479,

1484 (9th Cir. 1992).  "However, procedural inadequacies that result in a loss of educational

opportunity or seriously infringe on the parent's opportunity to participate in the IEP formulation

process clearly result in the denial of a FAPE."  *Id.* (internal citations omitted).

 The IDEA also mandates substantive compliance with its provisions.  Whether the local

education agency provides a substantively adequate FAPE is based on the appropriateness of the

educational program it offers to the disabled student.  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 198-200

(1982).  The Supreme Court has held that a school district is not required to provide the student with

the best education available or services that maximize the children's abilities. *Id.* at 199. Instead, a school district is only required to provide a "basic floor of opportunity" consisting of access to specialized instruction and related services that are individually designed to meet the student's needs, and reasonably calculated to provide the student with some educational benefit that comports with the student's IEP. *Id.* at 201.

In the event a student's parents believe the district is not complying with the IDEA's substantive or procedural provisions, they are "entitled to 'an impartial due process hearing' conducted either by the state or local education agency[.]" *Ojai*, 4 F.3d at 1469. After such a proceeding, "any party aggrieved by the findings and decision" of the administrative proceedings may file a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

**B.     Factual Background**

Plaintiff is an eight-year-old boy diagnosed with autism. Because of his disability, Plaintiff is eligible for special education and related services pursuant to the IDEA and the California Education Code. *See generally,* 20 U.S.C. §§ 1400 *et seq*; Cal. Ed. Code §§ 56000 *et seq*. Although he is relatively high functioning, he has deficits in social skills and behavior which are impediments to his education. Specifically, Plaintiff has "language processing deficits" which lead to frustration and distraction. (Hearing Officer Decision at 13.)[2] When confronted with stressful or frustrating situations, he tends to act out, either hitting himself, others, or crying out. (*Id.*) Novel situations and transitions are difficult for Plaintiff. (*Id.*) Because of these problems, the parties and the hearing officer ("HO") agreed that Plaintiff "requires a placement and services that provide close supervision, assistance with transitions, behavior redirection, and modification of the academic curriculum." (*Id.*) Specifically, this includes, adult one-to-one supervision throughout the school day; prompts to stay on task and keep focused; "time outs" to regroup; and specialized instruction in all subject areas. (*Id.*)

Plaintiff attends school in the San Ramon Valley Unified School District. During the 2001-2002 school year, Plaintiff was enrolled in a Special Day Class ("SDC") kindergarten, with 20% of his day spent main streaming in a general education classroom. Additionally, Plaintiff received 10

---

[2]Plaintiff concedes that the HO correctly assessed his needs. (Plaintiff's Motion at 16.)

United States District Court

For the Northern District of California

1  hours per week of in-home academic and behavioral support at the District's expense.  During the

2  2002-2003 school year, Plaintiff was enrolled in a SDC kindergarten with 30% inclusion in a general

3  education classroom.  The District also provided Plaintiff with a one-on-one aide and in-home

4  support at the District's expense.

5      In 2003-2004, Plaintiff was placed in a general education first grade class, where he spent

6  80% of his school day.  The remainder of his day was spent in an SDC.  The District continued to

7  provide Plaintiff with a one-to-one aide as well as in-home services.  Concerned with a perceived

8  regression in Plaintiff's behavior, his parents requested a functional analysis assessment ("FAA").

9  However, they rejected the findings of the FAA that District psychologist, Dr. Shirley Convirs,

10  conducted and requested that the District fund an independent FAA.

11      In December 2002, Plaintiff's parents filed a due process hearing request, alleging that the

12  District failed to provide Plaintiff with a FAPE and seeking compensatory education.  The parties

13  resolved these issues, as well as others that had arisen in the 2003-2004 school year, in a settlement

14  agreement dated June 4, 2004.  The settlement provided for an independent FAA to be conducted by

15  Synergistics Intervention ("SI") at the District's expense.  The June 4th settlement agreement also

16  included a "stay-put" provision which mandated that service described in the settlement would

17  remain in effect in the event of any future disputes.  (District Ex. 2.)

18      June 8 IEP Meeting

19      On June 8, 2004, the IEP team met to begin formulation of Plaintiff's IEP for the 2004-2005

20  school year.  Plaintiff's father attended the meeting.  The IEP team discussed services in

21  occupational therapy, speech, and language.  However, they were unable to complete the IEP offer at

22  this meeting.  The parents' and other IEP team members' schedules prevented the scheduling of the

23  next meeting for any earlier than August 16, 2004.

24      August 16 IEP Meeting

25      On August 16, 2004 the IEP team held a second meeting.  Both parents attended the August

26  16 meeting.  The District had hoped that SI would attend in order to discuss their independent FAA

27  of Plaintiff; however, because SI was unavailable, the parents provided the IEP team with a draft of

28  SI's FAA.  Although the IEP team agreed on occupational therapy and speech goals for the

1    upcoming school year, the team was again unable to complete the IEP offer.  As a result, the IEP

2    meeting was continued to August 25, 2004.

3    <u>August 25 IEP Meeting</u>

4        On August 25, 2004 the IEP team held a third meeting to formulate Plaintiff's IEP.  Both

5    parents attended the August 25 meeting in which the team discussed and adopted academic,

6    language arts, and math goals.  Halfway through the meeting, SI representatives arrived to discuss

7    their FAA of Plaintiff.  SI conceded that their FAA was incomplete and that they hoped to continue

8    their observations of Plaintiff at the commencement of the new school year.  After an hour of

9    answering the IEP team's questions, SI announced that it had to leave due to other engagements.  At

10   this point the IEP team attempted to schedule another meeting in order to finish the IEP offer.  The

11   IEP team highlighted, during these discussions, that school began on August 31.  Plaintiff's counsel,

12   Eileen Matteucci ("Ms. Matteucci"), informed the participants that she would be able to attend an

13   IEP meeting on August 30 after 2pm.  After SI indicated that they would not be able to attend, the

14   IEP team discussed the possibility of holding the next IEP meeting sometime in early September in

15   order to accommodate the parents' request to have SI complete their FAA and participate in the final

16   IEP meeting.  At that point, a District representative reminded the team that should there be no

17   placement offer before the start of school, the "stay put" provision would activate, allowing a

18   temporary continuation of the previous year's IEP placement until a new IEP was formed.  Ms.

19   Matteucci objected to this, stating that "if the District hasn't made an offer by the time school starts

20   then the parents are going to do what they have to do . . . the reality is they are not going to put him

21   back where he was."  (Joint Exhibit Alpha.)

22       At this juncture, the District asked Plaintiff's parents about their availability to attend a

23   meeting on August 30th.  Ms. Matteucci responded to the District's inquiry stating, "we're not

24   coming to a meeting without Synergistics."  (Joint Exhibit Alpha.)  Ms. Matteucci then informed

25   the participants that she wouldn't be able attend the August 30 meeting because she couldn't get

26   someone to cover for her on such short notice and the parents wanted her present at the meeting.

27   Ms. Matteucci also stated that although she could arrange her schedule, she wasn't going to, "not for

28   this." (Joint Exhibit Alpha.)  Ms. Matteucci again reiterated that neither she nor SI could not attend

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    the August 30 meeting.

2          After reciting the statutory imperative which requires that the District have an IEP in place

3    by the time school began on August 31, the District scheduled the final IEP for Tuesday, August 30.

4    Ms. Matteucci objected, stating that there wasn't enough information to conclude an IEP.  She then

5    threatened to "walk away" saying, "[i]t's really cool.  What happens then is that the lawyers, yours

6    and me, we both walk away with a pile of money."  (Joint Exhibit Alpha.)  The District then

7    reiterated that they would go ahead with the August 30 meeting and hoped the parents could come.

8    At this juncture, after a lengthy discussion centering around the prospect of an August 30 meeting,

9    Ms. Matteucci stated that the parents would not be able to attend.  The District stated that they had

10   not heard the parents say that they could not attend, to which, Ms. Matteucci replied, "[w]hen you

11   see my lips moving, I'm talking for them."  (Joint Exhibit Alpha.)  She went on to explain that the

12   parents could not take more time off work at such short notice.

13         Thereafter, in a fax sent to the District on August 26, 2004, the parents reiterated that they

14   would be unable to attend the August 30 IEP meeting "due to prior engagement[s]," and asked the

15   District to reschedule.  (Plaintiff's Ex. 69.)  The District replied in a fax dated August 26, 2004 that

16   "[d]ue to the procedural requirements of IDEA, the District must proceed with this scheduled

17   meeting in order to complete the remaining goals and objectives in [Plaintiff's] IEP and to make a

18   placement offer for the 2004/2005 school year."  (Plaintiff's Ex. 70.)

19         At the subsequent, Special Education Hearing due process hearing  (SEHO), Plaintiff's

20   parents testified regarding their failure to attend the August 30 meeting.  Plaintiff's mother testified

21   that she could not take more time off work to attend that meeting.  Plaintiff's father testified at the

22   SEHO that he did not want to attend without his wife, SI or his attorney present.  He also testified

23   that he could not find a baby sitter for Plaintiff and his sibling at that time.

24         <u>August 30 IEP Meeting</u>

25         The District held the IEP meeting on August 30, as scheduled.  The only remaining issues to

26   discuss were social and behavioral goals and objectives, as well as services in those areas.  Present at

27   the August 30 IEP meeting were Ms. Biondi, the District's Special Education Program

28   Representative; Mr. Anich, the District's Program Specialist; Dr. Convirs, the District Psychologist;

Ms. Connor, the District's Behavior Analyst; and Plaintiff's proposed teachers for the new school year. Plaintiff's parents did not in attend but sent a representative, Maxine Younger ("Ms. Younger"), to audiotape the meeting. SI, Plaintiff's then current behavioral support service provider, also did not attend the August 30 meeting.

The District's IEP offer was finalized at the August 30 meeting. Ms. Younger took the completed IEP offer to the parents that evening. The District's IEP offer included placing Plaintiff in a first grade general education classroom at a local school his parents had requested, with a one-to-one aide. Five percent of the program included support for working on his goals and objectives, which included speech and language, psychologist services, social skills training and behavior management. The offer did not include in-home services. In a fax dated August 30, 2004, Plaintiff's parents rejected the IEP offer. (District Ex. 21.) Subsequently, Plaintiff did not return to school. His parents retained SI to work with Plaintiff in an in-home program.

**C.      Procedural Background**

On September 16, 2004, Plaintiff filed for a due process hearing before SEHO, challenging the District's offer as both a substantive and procedural denial of a FAPE. Plaintiff also sought reimbursement of his parents' behavioral and education related costs incurred during the period the District denied him a FAPE. The parties had an administrative hearing before a special education hearing officer ("HO"). The SEHO hearing began on October 12, 2004 and lasted six days. The HO determined that Plaintiff's parents had "substantial input in their son's 2004-2005 [IEP] program." (HO Decision at 12.) Furthermore, the HO found that the District was forced to go forward with the August 30 meeting without Plaintiff's parents in attendance due to statutory requirements that an IEP be "in effect" prior to the start of school. (*Id.*) Accordingly, the HO found that "there was no serious infringement of the parents' opportunity for participation of the IEP team, and no loss of educational opportunity for [Plaintiff]." (*Id.*) The HO determined that the District complied with the IDEA both procedurally and substantively. Consequently, on January 4, 2005, the HO issued a decision holding that: (1) the District did not deny Plaintiff a FAPE during the 2004-2005 school year; and (2) Plaintiff was not entitled to reimbursement for costs incurred for private behavioral intervention and educational services.

7

On April 5, 2005, Plaintiff filed this lawsuit (Doc. #1). In his complaint, Plaintiff challenges the administrative decision on the ground that the HO's findings are not supported by the evidence and are incorrect as a matter of law. He seeks a ruling from this Court that: (1) the District failed to offer him a FAPE for the 2004-2005 school year; and (2) his parents are entitled to reimbursement for all costs incurred in providing Plaintiff with private behavioral intervention and educational services during the period of time a FAPE was denied.

**LEGAL STANDARD**

**A.      Summary Judgment Under the IDEA**

The IDEA provides that a party aggrieved by the decision of the state administrative body has the right to bring a civil action in federal district court in order to secure review of the disputed findings and decision. *See* 20 U.S.C. § 1415(i)(2). The party challenging the decision bears the burden of persuasion on its claim. *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

A motion for summary judgment under the IDEA differs from the typical summary judgment under the Federal Rules of Civil Procedure. Though the procedure may be called a motion for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). Under the IDEA, a district court, reviewing an administrative determination, is to "receive the records of the administrative proceedings," and must "hear additional evidence at the request of a party, and [base] its decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2). "The Ninth Circuit has interpreted this as calling for *de novo* review." *Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996) (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1993). What constitutes "additional evidence" may be comprised of evidence outside the administrative record. *See Capistrano*, 59 F.3d at 890. Nevertheless, the preponderance of the evidence standard in the IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. The IDEA's requirement that the district court "receive" the administrative record "carries with it the implied requirement that due weight shall be given to [those] proceedings." *Id.*

1    Therefore, "[t]he district court should review [the administrative record] for procedural compliance

2    with [the IDEA], and for whether the program [implemented in compliance with the IDEA] is

3    reasonably calculated to enable the child to receive educational benefits." *Capistrano*, 59 F.3d at

4    891.

5           Judicial review of state administrative proceedings under the IDEA is less deferential than

6    review of other agency actions. *Ojai*, 4 F.3d at 1471.  However, because Congress intended states to

7    have the primary responsibility for formulating each individual child's education, "courts must give

8    'due weight' to judgments of education policy when they review state hearings" under the IDEA.

9    *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (citing *Rowley*, 458 U.S. at

10   206).  A district court, reviewing the administrative record, has discretion to determine how much

11   weight will be given to the decision of the administrative court.  *Ojai*, 4 F.3d at 1472.  One criterion

12   for determining how much weight is due is the thoroughness of the findings of the administrative

13   court.  *Capistrano*, 59 F.3d at 891.[3]  After such consideration, "the court is free to accept or reject

14   the findings in part or in whole." *Gregory K.*, 811 F.2d at 1311.  When the court has before it all the

15   evidence regarding the disputed issues, it may make a final judgment in what "is not true summary

16   judgment procedure [but] a bench trial based on a stipulated record." *Ojai*, 4 F.3d at 1472;

17   *Capistrano*, 59 F.3d at 892.

18                                          **ANALYSIS**

19          In determining whether the District denied Plaintiff a FAPE, the court must engage in a

20   two-step inquiry.  First**,** the court must examine "whether 'the State complied with the procedures

21   set forth in the Act' and second, whether 'the individualized educational program developed through

22   the Act's procedures [was] reasonably calculated to enable the child to receive educational

23   benefits.'" *Amanda J.*, 267 F.3d at 890 (quoting *Rowley*, 458 U.S. at 206-07).  However, the court

24   need not reach the question of substantive compliance if the court finds  "procedural inadequacies

25   that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to

26   participate in the IEP formulation process, or that caused a deprivation of educational benefits."

27   _____

28        [3]The administrative court heard six days of testimony from 12 witnesses, considered over 300 pages of hearing exhibits submitted by Plaintiff and over 300 pages of hearing exhibits submitted by Defendant.  Upon reviewing the record, the Court finds the administrative decision very thorough.

*United States District Court*
For the Northern District of California

*Vashon Island*, 337 F.3d 1115, 1129 (9th Cir. 2003) (quoting *Amanda J.*, 267 F.3d at 892).

**A.      Procedural Inquiry**

     **1. Parental Involvement**

      Plaintiff tenders several arguments in support of its assertion that the District violated the procedural requirements of the IDEA.  Initially, Plaintiff argues that the District violated the procedural requirements of the IDEA because it made an offer of placement to him without his parents' participation in the August 30 IEP meeting. The District counters that it made a good faith effort to schedule a meeting at a time when the parents could attend and given the parents' refusal to abide by the "stay put" agreement and the impending start of the school year, its decision to move forward with an IEP meeting on August 30 in order to have an IEP "in effect" for Plaintiff at the beginning of the school year did not violate Plaintiff's procedural rights under the IDEA.  Moreover, the District argues that Plaintiff's parents attendance and participation at three out of four IEP meetings clearly establishes that Plaintiff's parents had a meaningful opportunity to participate in the formulation of Plaintiff's IEP.  As such, the District asks this court to conclude that Plaintiff was not denied a FAPE due to lack of parental participation.

      A parent's right to be involved with the creation and development of their child's educational plan is one of the most important procedural safeguards provided for by the IDEA.  *Amanda J.*, 267 F.3d at 882.  "Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know."  *Id.*  Therefore, the IDEA provides that the parents of a child with disabilities must be afforded "an opportunity . . . to participate in meetings with respect to the identification, evaluation, and educational placement of the child."  20 U.S.C. § 1415(b)(1).   The regulations promulgated under the IDEA place the burden on the District to "take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded an opportunity to participate[.]"  34 C.F.R. § 300.345(a).  This includes early notification of meetings to ensure parental participation.  34 C.F.R. § 300.345(a)(1).  Also, the District must take steps to "schedul[e] the meeting at a mutually agreed on time and place."  34 C.F.R. § 300.345(a)(2).

United States District Court

For the Northern District of California

1    It is also clear that the IDEA does contemplate circumstances where the formulation of an

2    IEP can take place without parental participation.  The regulations provide that an IEP meeting "may

3    be conducted without a parent in attendance if the public agency is unable to convince the parents

4    that they should attend."  34 C.F.R. § 300.345(d).  Under this regulation, "before it can hold an IEP

5    meeting without a child's parents, the school district must document phone calls, correspondence,

6    and visits to the parents demonstrating attempts to reach a mutually agreed upon place and time for

7    the meeting."  *Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072, 1078 (9th Cir. 2003)

8    (citing 34 C.F.R. § 300.345(d)(1)-(3)).[4]

9    In addition,  "[n]ot every procedural violation . . . is sufficient to support a finding that the

10   child in question was denied a FAPE."  *Amanda J.*, 267 F.3d at 892.  Mere technical deviations from

11   the requisite procedures are not enough.  *Id*.  In order for the Court to determine that the District

12   denied the child a FAPE, there must exist "procedural inadequacies that result in the loss of

13   educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP

14   formulation process, or that caused a deprivation of educational benefits."  *Vashon Island*, 337 F.3d

15   at 1129 (quoting *Amanda J.*, 267 F.3d at 892).

16   In determining whether the District's action here, in scheduling and its ultimate offer of an

17   IEP to EP, infringed upon his parents' opportunity to participate in the IEP formulation process and

18   a denial of a FAPE, the parties rely upon several Ninth Circuit cases.  Plaintiff argues that on the

19   record before the Court, the Ninth Circuit's decision in *Shapiro v. Paradise Valley Unified Sch.*

20   *Dist.,* 317 F.3d 1072, 1078 (9th Cir. 2003), compels a finding, on this record, that E.P.'s was denied

21   a FAPE. The District, relying upon the Ninth Circuit's decision in *Ms. S. ex rel. G. v. Vashon Island*

22   *School D.*, 337 F.3d 1115 (9th Cir. 2003), contends that the record amply supports a finding that no

23   procedural violation occurred here resulting in a denial of FAPE.  The Court finds that Plaintiff's

_____

24

25   [4]In this case, the record reflects that the District fulfilled its obligations to "take steps" to ensure Plaintiff's parents were involved in the IEP process overall.  The record also shows the District's attempts to arrange a "mutually agreed upon

26   place and time" for the final IEP meeting.  During the August 25 IEP meeting, the District made a good faith attempt to schedule the final IEP meeting at a "mutually agreed upon place and time."  At that meeting, the District repeatedly reiterated

27   that it hoped the parents could be present at the final IEP meeting.  Further, it was not until the very end of the meeting, after a long discussion centering on August 30, that Matteucci mentioned the parents' inability to attend the August 30 meeting.

28   Finally, the district also sent the parents a notice of the meeting on August 26, 2004 in an attempt to have them participate in the final IEP.

reliance upon *Shapiro* is misplaced and that the record here supports a finding that the District did not deny Plaintiff's parents an opportunity to participate in the formulation of the IEP- resulting in a denial of FAPE.  In *Shapiro*, the court found the school district's failure to include the parent in an IEP meeting constituted denial of a FAPE within the meaning of IDEA.  *Shapiro*, 317 F.3d at 1074. The minor's  parents in *Shapiro* attended two IEP meetings at which the IEP team discussed placing the plaintiff in a newly developed program.  *Id.* at 1074-75.  Fearing that their daughter was to be a "guinea pig" for the school's new program, the parents filed for a due process hearing.  *Id.* at 1075. Prior to the due process hearing the school noticed a third IEP meeting.  *Id.*  Although the parents notified the district that they would be unable to attend the meeting and requested a postponement, the district claimed that it could not reschedule the meeting because two of its IEP team members would be unavailable after that date.  *Id.*  The district went ahead with the IEP meeting without the parents, the child's current teacher, and without independently evaluating the child, and instead relied on information gathered from the two previous meetings to draft an IEP.  *Id.*

The *Shapiro* court found that the school district had violated the procedural requirements of the IDEA when it failed to include the parents in the last IEP meeting.  *Id.* at 1078.  In support of this finding, the court noted that the parents attempted to reschedule the meeting, but the district had "simply prioritized its representatives' schedules over that of [the] parents" in deciding to go forward with the meeting without them.  *Id.*  Further, the court found that the district's inclusion of the parents in some parts of the IEP process did not excuse the district's failure to include the parents in the later IEP decisions.  *Id.*  The fact that the district mailed the parents a copy of the IEP for their approval was also unavailing, as the court found that "[a]fter-the-fact parental involvement is not enough."  *Id.*  The court reasoned that "those individuals, like [plaintiff's] parents, 'who have first hand knowledge of the child's needs and who are most concerned about the child must be involved in IEP creation process.'" *Id.* (quoting *Amanda J.*, 267 F.3d at 891).  The court stated that "involvement in the 'creation process' require[d] the [district] to include the [parents] unless they affirmatively refused to attend."  *Shapiro*, 317 F.3d at 1078.

**United States District Court**
For the Northern District of California

1    Plaintiff argues that his case mirrors *Shapiro*.  He contends that here, as in *Shapiro*, the

2  school district made an IEP offer without parental participation in the final IEP meeting.  Plaintiff

3  contends that, as in *Shapiro*, the District prioritized its staff's schedules over that of the parents in

4  determining the date the meeting would be held.  This Court, however, disagrees with Plaintiff's

5  characterization of the record and finds the instant case to be distinguishable from *Shapiro*.  First, as

6  the HO pointed out,  "[u]nlike the facts in *Shapiro*, at least one parent chose not to attend a critical

7  IEP meeting on the last possible day to complete the development of their son's program."  (HO

8  Decision at 12.)   It was not until the very end of the meeting, after Ms. Matteucci threatened that

9  they would walk away, that the parents' unavailability for the August 30 IEP meeting was ever

10  mentioned.  (Joint Exhibit Alpha.)  At no time during this scheduling discussion on August 25 did

11  the parents ever speak for themselves, or offer any explanation other than that given by Ms.

12  Matteucci.  (Joint Exhibit Alpha.)  Further, during his testimony at the SEHO hearing, Plaintiff's

13  father testified regarding his ability to attend the August 30 IEP saying, "I would had [sic] to - I

14  think I had to juggle a lot of stuff possibly."  (Administrative Record Transcript ("AR Tr.")

15  10/12/04, 133:23.)  This statement does not evince the absolute inability to attend the IEP meeting

16  that was present in *Shapiro*.

17    Second, the District here was not "simply prioritiz[ing] its representatives' schedules over

18  that of the parents."  *Shapiro*, 317 F.3d at 1078.  Rather, the District had a statutory obligation to

19  have an IEP "in effect" for Plaintiff at the beginning of the school year.  *See* 20 U.S.C. §

20  1414(d)(2)(A).  The District was open to scheduling the meeting after the start of the school year to

21  allow for the presence and participation of SI and the minor's parents.  The District noted, with

22  respect to scheduling of an appropriate meeting date that the "stay put" provision fashioned at the

23  June 4, 2004 settlement would activate were they unable to agree on an IEP before the start of

24  school.  However,  after Ms. Matteucci stated that the parents were unwilling to abide by the "stay

25  put" agreement, the discussion reverted back to the need to schedule the meeting in accord with the

26  requirement that an IEP offer be tendered to the parents before school began.  During a lengthy

27  scheduling discussion, Ms. Matteucci originally stated that she would be available for the August 30

28  meeting.  (Joint Exhibit Alpha.)  It was only later, after things got more contentious that she

1    retracted her offer of availability for August 30 and announced that the parents could not attend as

2    well.  Based upon the District's attempt to accommodate a more convenient meeting time, the

3    statutory requirement that the District have an IEP "in effect" at the beginning of the school year and

4    the parents' unwillingness to comply with the "stay put" agreement, this Court finds that the District

5    was not "simply prioritiz[ing] its representatives' schedules over that of [the] parents" as in *Shapiro*.

6    Rather, the District here made a good faith effort to schedule a "mutually agreed on time and place"

7    for the final IEP meeting.

8            The record before the Court simply does not reflect an instance of a school district seeking to

9    unilaterally create an IEP without the participation of the parents or other necessary IEP team

10   members who could give knowledgeable input into the IEP process.  Although Plaintiff attempts to

11   cast the August 30 IEP offer as "after-the-fact parental involvement" like that in *Shapiro*, the Court

12   finds that the parents were afforded a substantial opportunity to participate in the formulation of the

13   IEP such that this procedural violation did not seriously infringe upon their right to parental

14   involvement or result in a loss of educational opportunity.  One or both of the parents had attended

15   the three other IEP meetings.  Testimony shows that Plaintiff's parents customarily answered

16   questions and contributed to team discussions.  They also undertook to compile a comparison chart

17   that they presented to the District.  The District did not present a completed IEP to Plaintiff's parents

18   on a "take-it-or-leave it" basis.  Here, the District offered a "safety net" to the parents in effect

19   allowing the parents to request an IEP later in the school year to consider their concerns with the

20   proposed 2004-2005 IEP.  (District Ex. 22.)  This is further evidence of the District's good faith

21   effort to collaborate with the parents in order to come to a consensus regarding Plaintiff's 2004-2005

22   IEP.

23           The Court agrees with the District that *Vashon Island*, which represents the opposite end of

24   the spectrum from *Shapiro*, is more closely analogous to the case at bar.  In *Vashon Island*, the Ninth

25   Circuit found the preparation of an IEP offer, outside an IEP meeting, does not violate a district's

26   IDEA obligations where the district has afforded the parents a meaningful opportunity to participate

27   in the IEP process, as long as the parents have a right to a due process hearing regarding that IEP.

28   *Vashon Island*, 337 F.3d at 1132.  In *Vashon Island*, the district offered the parent a meaningful and

United States District Court

For the Northern District of California

1   substantial opportunity to participate in the IEP process, attempting to convene several IEP

2   meetings.  *Id.*  These attempts by the district were unsuccessful.  *Id.*  When the parent finally showed

3   up at an IEP meeting, she continuously disagreed with the district's plan for her daughter and the

4   parties never came to a consensus regarding placement or an IEP for her daughter.  *Id.* at 1121-22.

5   As a concession to the parent the district implemented many of the changes in the IEP which the

6   parent had demanded.  *Id.* at 1132.  However, the parent was uncooperative and merely sought to

7   exercise a veto power over the school district's IEP offers.  *Id.* at 1131-32.  The Court held that

8   "where the school district has repeatedly provided the parent with the opportunity to participate

9   meaningfully in the in the IEP process, the school district has not violated its obligation under 34

10  C.F.R. § 300.345 (1995), which requires the school district to 'take steps to ensure that one or both

11  parents . . . are afforded the opportunity to participate' in IEP meetings[.]"  *Id.* at 1133.

12          Plaintiff argues that *Vashon Island* is distinguishable on its facts and therefore does not apply

13  to the case at bar.  However, although the facts here are not as egregious as the parental behavior in

14  *Vashon Island*, this Court finds that *Vashon Island*, supports the Court's finding that no procedural

15  violation arising out of a lack of meaningful parental participation occurred here.  First, Ms.

16  Matteucci first advised the District that Plaintiff's parents refused to abide by the "stay put"

17  provision at the August 25 meeting and, as such, the District and other parties were forced to

18  schedule a meeting within the few remaining days before school started in order to comply with the

19  statutory requirement to have an IEP "in effect" at the beginning of the school year.  After initially

20  stating her availability for August 30, the discussion then focused around that date.  When it became

21  clear that the meeting would have to be held on August 30, Ms. Matteucci threatened to "walk

22  away" saying, "[i]t's really cool.  What happens then is that the lawyers, the district's and myself,

23  walk away with a pile of money."  (Joint Exhibit Alpha.)  In effect, given the position taken by Ms.

24  Matteucci on behalf of the parents at the August 25 meeting, the District in the position of being in

25  violation of the IDEA no matter what course it took.  If the meeting was held after the beginning of

26  the school year, Plaintiff would have been without an IEP or placement because the parents refused

27  to comply with the "stay put" agreement.  Conversely, if the IEP meeting was held on August 30, the

28

1   last possible day before the beginning of the school year, the parents would not participate.[5] *Vashon*

2   *Island* is instructive in such a situation:

3           [A]lthough the formulation of an IEP is ideally to be achieved by consensus
        among the interested parties at a properly conducted IEP meeting, sometimes
4       such agreement will not be possible.  If the parties reach a consensus, of
        course, the [IDEA] is satisfied and the IEP goes into effect.  If not, the
5       agency has the duty to formulate the plan to the best of its ability in
        accordance with information developed at [prior] meetings, but must afford
6       the parents a due process hearing in regard to that plan.

7   337 F.3d at 1132.   Here, after it was clear to the District that Plaintiff's parents and Ms. Matteucci

8   would not cooperate in the process and no agreement as to a meeting time could be had, the District

9   proceeded to formulate the IEP to the best of its ability.  Plaintiff duly exercised his right to a due

10  process hearing at which the HO determined that there had been no procedural violation of the IDEA

11  such that Plaintiff had been denied a FAPE.  Moreover, as previously stated, Plaintiff's parents were

12  afforded a substantial and meaningful opportunity to participate in the formulation of Plaintiff's IEP.

13  They attended three other IEP meetings, routinely contributing to team discussions.  Although the

14  IEP team could not come to a consensus prior to the final IEP meeting, the District utilized

15  information from the three prior IEP meetings in formulating Plaintiff's 2004-2005 IEP.

16  Accordingly, this Court finds that Plaintiff's parents absence at the final IEP meeting on August 30

17  did not "result in the loss of educational opportunity, or seriously infringe the parents' opportunity to

18  participate in the IEP formulation process, or . . . cause[] a deprivation of educational benefits" to

19  Plaintiff.  *Vashon Island*, 337 F.3d at 1129 (quoting *Amanda J.*, 267 F.3d at 892).  The Court,

20  therefore, finds no error with the HO's decision.

21          **2.      Other Critical Team Members**

22                  **a.      Regular Education Teacher**

23          Plaintiff next advances that the District committed a procedural error when it failed to

24  include a former regular education classroom teacher who had previously worked with Plaintiff at

25  the August 30 IEP meeting.  In formulating the IDEA, Congress recognized that "[v]ery often,

26  _____

27          [5]There is no evidence showing that any other date prior to the beginning of the school year (Thursday, August 26
    or Friday, August 27) would have been a feasible choice.  Plaintiff's parents stated that they were not able to attend the
28  August 30 IEP because they could not reschedule work and babysitting at such short notice.  If the Court were to take as true
    Plaintiff's parents' reasons for not attending the August 30 IEP, then certainly those reasons hold equally as true for August
    26 and 27 as well.

regular education teachers play a central role in education of children with disabilities." H. Rep. No. 105-95, at 103 (1997). The IDEA seeks to "mainstream" disabled children into general education classrooms as much as possible in order to help them "meet developmental goals," and "be prepared to lead productive and independent adult lives." 20 U.S.C. § 1400(c)(5). To that end, the IDEA requires the IEP team to include "at least one regular education teacher" and "at least one special education teacher." 20 U.S.C. § 1414(d)(1)(B); *see also* 34 C.F.R. § 300.344(a).

In *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 643 (9th Cir. 2004), the Ninth Circuit held that there is a mandatory requirement that at least one regular education teacher be included in the IEP team. In *Federal Way*, none of the students' past, current or future regular education teachers were included in the IEP meeting. *Id.* at 640. The court noted that although it would have been most useful to have input at the meeting from a teacher familiar with the student, "any regular education teacher would have contributed his or her knowledge of the ability of a disabled student to benefit from being placed in a regular education classroom. *Id.* at 649.

Here, no former classroom teacher of Plaintiff was present at the August 30 meeting. In support of his argument that the absence of a current regular education teacher from the August 30 meeting resulted in a procedural violation of the IDEA, Plaintiff cites *Shapiro*'s holding that the IEP team must include a current teacher. *See Shapiro*, 317 F.3d at 1076-77. Since the relevant events in *Shapiro* occurred in 1994, before Congress amended the IDEA in 1997, *Shapiro*'s interpretation of the relevant statutory language to require the "current" regular education teacher differs from the interpretation of the statutory language post-1997 in which "at least one regular education teacher" must be included on the IEP team.[6] This Court interprets *Federal Way* to mean that cases whose applicable events occurred post-1997 (when Congress amended the statute) do not require that the student's current regular education teacher be present at the meeting, rather, it only requires "at

---

[6]The applicable statutory language in effect during the relevant events in *Shapiro* stated that, "[t]he term 'individualized education program' means a written statement for each child with a disability developed in any meeting by a representative of the local educational agency . . . , *the teacher*, the parents or guardian of such child, and, whenever appropriate, such child[.]" 20 U.S.C. § 1401(a)(20) (1994) (emphasis added). The corresponding portion of the 2003 IDEA, 20 U.S.C. § 1414(d)(1)(B) only requires "at least one regular education teacher" to be a member of the IEP team.

17

least one regular education teacher" to be present at the IEP meeting.[7]  20 U.S.C. § 1414(d)(1)(B).

Here, the record shows that both a regular education teacher and a special education teacher who were to be Plaintiff's teachers in the upcoming year were included in the August 30 IEP meeting.  (District Ex. 20,  p. 1.)  This is all the IDEA requires.  Here, Plaintiff received the benefit of having present at the August 30 IEP meeting those teachers who would be primarily responsible for implementing his IEP in the upcoming school year.[8]  Therefore, the Court finds that the District did not violate the procedural safeguards of the IDEA when it failed to have a current teacher or even a teacher who was familiar with Plaintiff present at the final IEP meeting.

Finally, assuming without finding, a statutory mandate requiring the presence of the "current" regular education teacher at the IEP meeting, the Court notes that a majority of the three judge panel in *Federal Way* held that a harmless error standard should be applied in deciding whether or not the absence of the regular education teacher was such that the student was denied a FAPE.  *Federal Way*, 394 F.3d at 636.  In order for the absence of a regular education teacher to be a procedural violation that results in a denial of a FAPE, the absence must be such that it results in a loss of educational opportunity or seriously infringes upon the right of parental participation in the IEP process.  *Id.* at 658.

On this record, the Court finds that the absence of the "current" regular education teacher at the August 30 IEP meeting did not result in denial of a FAPE.   The record shows that Karen Dautel, Plaintiff's "current" regular education first grade teacher from the 2003-2004 school year, was present at the June 8, August 16 and August 25 IEP meetings.  (District Ex. 3, 14, and 16.)  Further, Plaintiff's proposed regular education teacher for the 2004-2005 school year, Kathleen Hermann, was present at both the August 25 and August 30 IEP meetings.  (District Ex. 16, 20.)  Therefore,

---

[7]"Prior to 1997, the IDEA provided that the school district was obligated to include the student's current teacher as a member of the IEP team.  In 1997, Congress revised the IDEA to require the inclusion of 'at least one regular education teacher of such child (if the child is, *or may be*, participating in the regular education environment)' and 'at least one special education teacher, or where appropriate, at least one special education provider of such child.'" *Federal Way*, 394 F.3d at 643 (quoting 20 U.S.C. § 1414(d)(1)(B)).

[8]The inclusion of Plaintiff's soon-to-be teachers is also supported by the interpretory notes appended to the applicable regulations which provide that"[t]he regular education teacher who serves as a member of a child's IEP team should be a teacher who is, or may be, responsible for implementing a portion of the IEP, so that the teacher can participate in discussions out how best to teach the child."  34 C.F.R. PART 300 APPENDIX A, #26.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    there was not only "at least one regular education teacher" present at each of the IEP meetings, but

2    there was also an overlap of the two teachers who were both present at the August 25 IEP meeting.

3    This provided a continuity of knowledge between the regular education teacher of the 2003-2004

4    school year and the proposed regular education teacher for the 2004-2005 school year, such that the

5    IEP team could adequately proceed in the August 30 IEP meeting to complete Plaintiff's 2004-2005

6    IEP.  This Court therefore finds that, even if there hypothetically was a procedural violation, under

7    the harmless error test this violation did not result in a loss of educational opportunity for Plaintiff,

8    and correspondingly, did not result in a denial of a FAPE.[9]

9                         **b.    Behavioral Skills Specialist**

10           Plaintiff also contends that the absence of his then-current behavioral skills specialist was a

11   procedural violation which resulted in a denial of a FAPE.  The IDEA states that "at the discretion of

12   the parent or the agency, other individuals who have knowledge or special expertise regarding the

13   child, including related services personnel," may be included in the IEP team "as appropriate."  20

14   U.S.C. § 1414(d)(1)(B)(vi); 34 C.F.R. § 300.344(a)(6).  However, although this provision "allow[s]

15   the parent to bring a participant of the parent's choice or the district to bring a participant of its

16   choice, these provisions do not allow the parent to demand that the district bring a non-enumerated

17   individual, or vice versa."  *Vashon Island*, 337 F.3d at 1136.

18           Here, Plaintiff's parents wanted Plaintiff's then current behavioral skills provider, SI, to be

19   included in the August 30 meeting. The District did not refuse to invite SI.  SI was simply

20   unavailable for the August 30 meeting.  Further, SI had been invited to partake in several of the

21   previous IEP meetings.  SI was unavailable for the August 16 meeting.  However, it had participated

22   in the August 25 meeting, after arriving half-way through the meeting and leaving prior to the

23   meeting's completion.  Finally, there is no evidence that SI's participation would have changed

24   Plaintiff's IEP in any manner as SI had not yet completed its FAA of Plaintiff, and would not be able

25

26           [9]Further, "while a regular education teacher must be a member of the IEP team if the child is, or may be,
     participating in the regular education environment, the teacher need not (depending on the child's needs and the purpose of
27   the specific IEP team meeting) be required to participate in all decisions made as part of the meeting or to be present
     throughout the entire meeting *or attend every meeting*. . . . The extent to which it would be appropriate for the regular
28   education teacher member of the IEP team to participate in IEP meetings must be decided on a case-by-case basis." 34 C.F.R.
     Part 300 APPENDIX A, #24 (emphasis added).

1   to do so until school began.

2   **B.      Substantive Inquiry**

3          Plaintiff argues that the District substantively denied him a FAPE in the 2004-2005 IEP

4   offer. Plaintiff contends that the District failed to develop appropriate social skills and behavioral

5   goals and objectives.  Plaintiff also maintains that the District failed to offer appropriate programs

6   and services in those areas, specifically pointing to a lack of an in-home ABA program and

7   transition plan.  The District responds that its 2004-2005 IEP offer was sufficient to provide Plaintiff

8   with a FAPE for that school year.

9          The IDEA provides that

10          [t]he term "free appropriate public education" means special education
            and related services that - (A) have been provided at public expense,
11          under public supervision and direction, and without charge; (B) meet
            the standards of the State educational agency; (C) include an
12          appropriate . . . elementary . . . school education in the State involved;
            and (D) are provided in conformity with the [child's] individualized
13          education program.

14   20 U.S.C. § 1401(8).  Therefore, a FAPE "consists of educational instruction specially designed to

15   meet the unique needs of the handicapped child, supported by such services as are necessary to

16   permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89.  The Supreme Court

17   has interpreted this to mean that the school district need only provide the handicapped child with a

18   "basic floor of opportunity" in order to give such children equal access to public schools.  *Id.* at 200.

19   However, "in seeking to provide such access to public education, Congress did not impose upon the

20   [school district] any greater substantive educational standard than would be necessary to make such

21   access meaningful." *Id.* at 192.  As such, there is no additional substantive requirement to

22   "maximize each child's potential." *Id.* at 198.  In order to afford the child a FAPE, the IEP need

23   only be "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207.

24          Although the IDEA gives parents of handicapped children the right to bring a civil action in

25   federal court challenging the findings of an administrative decision, "courts must be careful to avoid

26   imposing their view of preferable educational methods upon the States." *Id.* at 207.   Therefore,

27   "because Congress intended states to have the primary responsibility for formulating each individual

28   child's education, [courts] must defer to their 'specialized knowledge and experience' by giving 'due

United States District Court

For the Northern District of California

1    weight' to the decisions of the states' administrative bodies." *Amanda J.*, 267 F.3d at 888 (quoting

2    *Rowley*, 458 U.S. at 206-208).

3        Reviewing the 2004-2005 IEP offer, the Court finds that it was "reasonably calculated" to

4    provide Plaintiff a FAPE. First, the IEP was "designed to meet [Plaintiff's] unique needs." *Rowley*,

5    458 U.S. at 188-89. To accommodate Plaintiff's need for constant adult one-to-one supervision, the

6    IEP provides him with a personal in-classroom aide. Because Plaintiff has "language processing

7    deficits" that effect his academic performance, the 2004-2005 IEP provides for speech and language

8    three times a week and a resource specialist to address his academic needs. The IEP also provides

9    for a behavioral specialist and a behavioral analyst to work with Plaintiff, his one-to-one aide and his

10   teacher in order to address his social and behavioral issues that impede his academic progress.

11   Further, the social skills and behavioral goals and objectives were developed with the "unique

12   needs" of Plaintiff in mind.[10]

13       Second, the Court finds that this educational plan is "supported by such services as are

14   necessary to permit [Plaintiff] 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89. As

15   noted, the IEP provides for a one-to-one aide as well as a variety of in-school services to address

16   Plaintiff's unique needs.[11] Plaintiff alleges that he was denied a FAPE because the IEP did not

17

18       [10]Plaintiff primarily takes issue with the data the District presented in support of its contention that Plaintiff had
19   improved and progressed during the 2003-2004 school year. Plaintiff argues that this same erroneous data from the 2003-
     2004 school year was also used to formulate the 2004-2005 IEP. However, this Court agrees with the finding of the HO that
20   the data collected by the District substantially reflected Plaintiff's progression towards his goals during the 2003-2004 school
     year. Ms. Sletvett, the District behavioral specialist, charted Plaintiff's behaviors in early 2004. These charts tended to show
21   Plaintiff's improvement between January and May 2004. In weighing this data, the HO and this Court note that Ms. Sletvett
     had experience working with children on the autism spectrum and had worked with Plaintiff since 2002. She was therefore
22   in a position to recognize and document the overall progression of Plaintiff towards his goals. This Court also finds that Ms.
     Palomba's data, which tends to show that Plaintiff was taken out of class more frequently, does not show, as Plaintiff
23   contends, that he was regressing. Rather, it merely serves to confirm the fact that Plaintiff needs one-to-one supervision with
     "time outs" when things become stressful and frustrating to him. It also reflects upon the fact that the 2003-2004 IEP
24   provided for greater inclusion (80% up from 30% provided for in 2002-2003) in a regular education classroom than he had
     ever experienced before.

25

26       [11]Plaintiff argues that the allegedly inaccurate data of the District also reflects the poor quality of the services
     provided by those collecting the data. In particular, Plaintiff argues that the incorrect data collected by Plaintiff's one-to-one
27   aide, Ms. Palomba, shows that any IEP which would include her as a service provider would be necessarily deficient. This
     Court finds that Plaintiff's criticism of Ms. Palomba is misplaced. Ms. Palomba's job was to assist Plaintiff in the classroom
28   and provide a communication log to keep Plaintiff's parents generally apprised of his classroom activities, not to provide
     detailed data of Plaintiff's behavior. Further, there is no indication, as Plaintiff contends, that Ms. Palomba's skill in data

United States District Court

For the Northern District of California

provide for an in-home program, as it had in previous years.  However, this Court finds an in-home program is not necessary in order to provide Plaintiff a FAPE.  This Court is persuaded by the HO's assessment that "controlling [Plaintiff's] behavior so that he can progress in the classroom is more effectively worked on at school, where developed skills can be generalized and applied directly to the classroom setting."  (HO's Decision at 16.)  Plaintiff also contends that he was denied a FAPE because the IEP failed to offer him a transition plan for the transfer of services from the private providers to the District providers, and for his transfer from one school to another.  This Court disagrees and finds that Plaintiff's transition needs were adequately taken care of in the IEP.  For continuity and ease of transition between schools, the IEP provided Plaintiff with the same one-to-one aide, Ms. Palomba.  Further, Plaintiff's parents had reported that Plaintiff had no transition problems when switching private service providers and therefore, the Court is not convinced that a transition plan would be necessary when Plaintiff transitioned back to District services.

In sum, this Court finds that, in crafting Plaintiff's 2004-2005 IEP, the IEP team considered Plaintiff's "unique needs" and those services "necessary to permit [Plaintiff] 'to benefit' from" his education, *Rowley*, 458 U.S. at 188-89, thereby providing a "basic floor of opportunity" such that Plaintiff had meaningful access to a public education.  *Id.* at 200.   This Court, therefore, agrees with the HO's finding that Plaintiff's 2004-2005 IEP was "reasonably calculated to enable [Plaintiff] to receive educational benefits."  *Id.* at 207.

## C.     Relief

Under the IDEA, the district court may "grant such relief as [it] determines is appropriate" to a party wronged by an IDEA violation.  20 U.S.C. § 1415(i)(2)(B)(iii).  Because the Court finds that the District did not deny Plaintiff a FAPE, Plaintiff is not entitled to compensatory education services or reimbursement for costs incurred by Plaintiff's parents in providing him with educational services provided by SI during the 2004-2005 school year.

---

collection at all correlates to her skill as a one-to-one aide to Plaintiff. Indeed, "detailed data collection would impede Ms. Palomba's role as [Plaintiff's] one-to-one aide."  (HO Decision at 15.)

**CONCLUSION**

Having thoroughly reviewed and considered the administrative record and the parties' briefs, the Court **DENIES** Plaintiff's Motion for Summary Judgment, and **GRANTS** Defendant's Cross Motion.

**IT IS SO ORDERED.**

Dated: June 21, 2007

_____
MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

23